Westerhaus Company et al. [1] v. Commissioner. Westerhaus Co. v. Commissioner
Docket Nos. 59557, 59558, 57549-57554.
United States Tax Court
T.C. Memo 1957-213; 1957 Tax Ct. Memo LEXIS 36; 16 T.C.M. (CCH) 958; T.C.M. (RIA) 57213; November 15, 1957
*36 Held: 1. Adjustments to Commissioner's net worth computation discloses no deficiency in Thomas's income tax. 2. Amounts of Joseph's unreported income determined by the Commissioner upon the basis of increases in net worth modified in certain respects. Additions to tax for fraud disapproved. Statute of limitations bars collection of tax for some years. Additions to tax for substantial underestimate of estimated tax to be computed under Rule 50. 3. Amounts of Frances's unreported income determined by the Commissioner upon the basis of increases in net worth modified in certain respects. Additions to tax for fraud disapproved. Statute of limitations bars collection of tax for some years. Additions to tax for substantial underestimate of estimated tax to be computed under Rule 50. 4. Thomas did not fraudulently understate his net income by knowingly overstating his sales promotion expenses. Amounts of such expenses determined. Statute of limitations bars collection of tax for some years. 5. Westerhaus did not fraudulently deduct certain entertainment, picnic, and Christmas expenses. Amount of entertainment and picnic expenses determined. Westerhaus failed to show that the Commissioner *37 erred in disallowing certain Christmas and travel expenses. Statute of limitations bars collection of tax for some years. 6. Amount of entertainment and picnic expenses incurred by Joseph on behalf of Westerhaus determined. Joseph failed to show that he incurred certain Christmas expenses on behalf of Westerhaus. 7. Westerhaus failed to show that it sustained a loss as a result of the seizure, by local law enforcement officers, of certain of its coin-operated machines and starter money therein. 8. Joseph's sales of stock of one wholly owned corporation to another wholly owned corporation at the current book values of the stock did not result in dividends to Joseph under sections 115(a) or 115(g), I.R.C. 1939. Book value is reliable as an approximation of the fair market value of the stock in the absence of any different showing by the Commissioner. Charles H. Elston, Esq., and Charles C. Boyle, Esq., Schmidt Building, Cincinnati, Ohio, for the petitioners. Robert E. Johnson, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in the petitioners' income tax and made additions to the tax for fraud and *38 for substantial underestimate of estimated tax, as follows: Additions to Tax
Taxable
Docket
Year or
Sec. 294
No.
Period
Deficiency
Sec. 293(b)
(d)(2)
57549
Joseph Westerhaus
1944
$ 9,262.88
$ 8,495.94
$ 864.38
1945
14,730.77
9,954.61
551.19
1946
4,163.09
345.49
1947
9,179.91
4,589.95
523.14
57550
Joseph and Marian
1948
2,054.04
1,027.02
A. Westerhaus
1949
14,717.08
7,358.54
867.14
1950
9,216.40
4,608.20
552.98
59558
Joseph and Marian
1951
27,585.22
A. Westerhaus
1952
53,106.80
1953
41,552.98
57551
Thomas Jackson
1944
21,196.80
11,266.83
1,352.02
1945
4,389.76
1,869.88
224.39
1946
8,901.46
4,450.73
534.09
1947
4,098.73
2,049.36
410.62
57552
Thomas and Celia
1948
709.54
354.77
Jackson
1949
1,817.54
908.77
1950
1,882.56
941.28
57553
Estate of Frances
1945
13,648.60
4,856.45
Westerhaus,
deceased
1946
22,114.08
8,580.70
1,169.46
1947
6,294.15
3,147.07
678.94
1949
1,534.77
1,198.87
1950
9,090.91
4,545.45
540.29
57554
Westerhaus Company
11-1-46 -
394.00
136.89
[1] 12-31-46 1947
9,318.59
4,922.90
1948
10,005.26
6,165.10
1949
8,675.67
5,055.15
1950
6,019.53
3,009.76
59557
Westerhaus Company
1951
5,727.06
1952
6,459.08
1-1 to
806.40
[2] 9-30-53 The petitioners in this case are the Westerhaus Company (herein referred *39 to as Westerhaus), its two principal stockholders during the taxable years, Frances Westerhaus, now deceased, and Joseph Westerhaus, and its sales manager, Thomas Jackson. Joseph's wife, Marian, and Thomas's wife, Celia, are also petitioners because they filed joint returns with their husbands in 1948 and all subsequent taxable years. The petitioners did not contest some of the Commissioner's adjustments and conceded that certain other adjustments made by him are correct. The Commissioner also made certain concessions. There are eight issues left for decision: (1) Whether the Commissioner properly reconstructed Thomas's income for 1944 through 1946 by the increase in net worth method and made additions to tax for fraud and for substantial underestimate of estimated tax. (2) Whether the Commissioner properly reconstructed Joseph's income for the years 1944 through 1950 by the increase in net worth method and made certain additions to tax for fraud and for substantial underestimate of estimated tax. (3) Whether the Commissioner properly reconstructed Frances's income for 1945, 1946, 1947, 1949, and 1950 by the increase in net worth method and made certain additions to tax for fraud and *40 for substantial underestimate of estimated tax. (4) Whether Thomas fraudulently understated his net income for the years 1947 through 1950 by knowingly overstating his sales promotion expenses and whether he substantially underestimated his estimated tax for 1947. (5) Whether deductions claimed by Westerhaus during the taxable period 1946, the years 1947 through 1952, and the taxable period 1953 for various business expenses which represented cash payments made to Joseph were ordinary and necessary business expenses and whether the returns for those years which reflected such deductions were fraudulent with intent to evade tax during the years 1946 through 1950. (6) Whether Joseph received constructive dividends during the years 1951 through 1953 by virtue of his reimbursement by Westerhaus for expenses he allegedly did not incur on its behalf during those years. (7) Whether Westerhaus is entitled to deduct the unrecovered cost of coin-operated machines and starter money therein which were seized by local law enforcement officers during the taxable period 1946, the years 1947 through 1952, and the taxable period 1953. (8) Whether Joseph received dividends during the years 1951 through *41 1953 when he sold stock of one wholly owned corporation to another wholly owned corporation. During the year 1950 Joseph sold stock of one wholly owned corporation to another wholly owned corporation. The question of whether the proceeds of the sale constituted a dividend to him that year is not in issue because the Commissioner failed to determine that a deficiency resulted from the sale and he did not affirmatively plead that there was an additional deficiency in this respect. Findings of Fact Some of the facts are stipulated. The stipulated facts and the pertinent exhibits are found as stipulated and are incorporated herein by this reference. Issue (1). Net Worth - Thomas Jackson The petitioner in Docket No. 57551 is Thomas Jackson. The petitioners in Docket No. 57552 are Thomas and Celia Jackson. Thomas and Celia are husband and wife and reside in Cincinnati, Ohio. Thomas filed individual income tax returns for the years 1944 through 1947 with the collector of internal revenue for the first district of Ohio. Thomas and Celia filed joint income tax returns for the years 1948 through 1950 with the same collector. Thomas is Vice President of Westerhaus, having been connected with *42 that company or its predecessor partnership since 1940. He entered the employ of Westerhaus as Sales Manager and has continued in that capacity ever since. His compensation is determined by the volume of Westerhaus business. Thomas has worked continuously since he was eight years old. He first started work as a newspaper boy and then was an office boy at the local telephone company. Thereafter he worked at the check desk of a railroad. Next he was a partner in a boxing arena. Subsequent to that he worked for a brewery and then a beverage company and in 1933 or 1934 he went into the business of manufacturing beer. This continued until 1940 when he was employed by Westerhaus. Thomas saved and invested money while he worked at the various jobs. Between 1921 and 1932 he bought stocks of the following companies: General Motors Corporation; Libby, McNeil, and Libby; American Rolling Mill; and Standard Brands. His cost of these stocks was almost $25,000. In 1926 he bought for $11,500 the home in which he and his wife still reside. Thomas bought a Buick automobile in 1939 which he drove until late 1945 when he traded it in on a new car. Westerhaus reimbursed him for his automobile expenses. *43 Thomas never smoked and only drank occasionally. Thomas and Celia had no children. Celia did all of her own housework and never had a maid. On his income tax returns for 1944, 1945, and 1946, Thomas claimed deductions for sales taxes paid in the amounts of $150, $150, and $350, respectively. In 1930 Thomas obtained a safety deposit box at the Central Trust Company in Cincinnati which he maintained throughout the taxable years. Westerhaus paid Thomas by check. Many of these checks he converted into cash. Thomas and Sam Nason bought certain real estate, located near Montgomery, Ohio, from Harry Olden in July 1944, for $60,000, which Thomas paid to Olden in cash. Thomas's contribution toward the purchase price was $30,000. Thomas and Nason were partners in the Fox & Crow Club which was located on the above-mentioned property. At the end of 1944 Thomas had invested $13,238.09 in the partnership and had $15,000 invested in the Montgo Company and $14,855 invested in the Bogre Company. These latter two companies were related to the operation of the Fox & Crow Club. Thomas filed with Hamilton County, Ohio, returns of taxable property, in which he listed property and values thereof, as of January *44 1, 1943, 1944, 1945, 1946, and 1947. In each return he reported no cash on hand or in safe deposit boxes. Thomas filed no income tax returns for the years 1930 to 1932, and filed non-taxable income tax returns for the years 1934, 1940, and 1941. Thomas filed income tax returns for the years 1933, 1935 through 1939, 1942, and 1943, and the following amounts of income tax were paid in reference to those years: Year
Taxes Paid
1933
$ 1.98
1935
3.20
1936
78.16
1937
72.90
1938
9.92
1939
13.38
1942
10,680.38
1943
6,738.83
Thomas's returns for all years prior to 1944 had been destroyed by order of the Commissioner before the investigation in this case began. The retained copies of Thomas's 1942 and 1943 nicome tax returns indicate that he reported net income on them in the amounts of $27,502.26 and $43,124.69, respectively. At the end of the years 1943 through 1946, Thomas owned assets, exclusive of cash on hand, acquired at cost with his own funds, in the following net amounts: 12-31-43
$ 78,035.51
12-31-44
112,286.34
12-31-45
124,338.99
12-31-46
162,885.46
Thomas's gross income, net income, and income tax as reported on his income tax returns for the years 1944, 1945, and 1946, were as follows: Year
Gross Income
Net Income
Income Tax
1944
$55,699.64
$47,240.95
$25,515.71
1945
36,492.42
30,334.35
13,702.33
1946
63,582.30
55,194.46
28,205.11
The *45 Commissioner rejected Thomas's computation of income for the years 1944, 1945, and 1946, and recomputed his income by the increase in net worth method. The Commissioner's computation of Thomas's net income for those years based upon increases in net worth plus non-deductible expenditures, is as follows: 1943
1944
1945
1946
Net worth as of December 31
$78,035.51
$112,286.34
$124,338.99
$162,885.46
Increases in net worth
$ 34,250.83
$ 12,052.65
$ 38,546.47
Plus: Income tax paid
26,443.07
17,898.95
16,447.04
Insurance premiums
1,813.55
1,812.55
1,811.90
Capital gain (or loss)
1,000.00
(1,000.00)
(1,235.04)
adjustment
Personal expenditures
5,000.00
5,000.00
10,000.00
Govt. bonds purchased for
93.75
112.50
112.50
Westerhaus children
Net income corrected
$ 68,601.20
$ 35,876.65
$ 65,590.52 Prior to January 1, 1944, Thomas accumulated not less than $28,000 in cash which he kept in a safety deposit box and had on hand at January 1, 1944. Thomas's personal expenditures for the years 1944, 1945, and 1946, did not exceed $3,000, $3,000, and $4,500, respectively. The Commissioner determined the deficiencies and additions to tax for the years 1944, 1945, and 1946 on February 9, 1955. Thomas's income tax returns for the years 1944, *46 1945, and 1946, were not fraudulent with intent to evade tax. Issue (2). Net Worth - Joseph Westerhaus The petitioner in Docket No. 57549 is Joseph Westerhaus. The petitioners in Docket Nos. 57550 and 59558 are Joseph and Marian A. Westerhaus. Joseph and Marian are husband and wife and reside in Cincinnati, Ohio. Joseph filed individual income tax returns for the years 1944 through 1947 with the collector of internal revenue for the first district of Ohio. Joseph and Marian filed joint income tax returns for the years 1948 through 1953 with the same collector. Joseph drove a bakery truck in 1933 and 1934. After his father's death in 1934, he also worked at night for his mother, Frances Westerhaus. During 1935 he quit his job with the bakery company and worked full time for his mother at the amusement device business. In 1942 Joseph became an equal partner with her in the business and continued as such until the company was incorporated in 1946. Joseph received 2,169 shares of Westerhaus stock upon its incorporation. His cost basis in those shares was $76,522.32. In 1951 Joseph bought his mother's interest in Westerhaus. Joseph borrowed from his mother in 1942 to purchase his 50 per *47 cent interest in the partnership Westerhaus Amusement Company and the balances payable on this loan at the end of the calendar years 1943 to 1947 were as follows: 12-31-43
$23,887.94
12-31-44
17,087.94
12-31-45
17,087.94
12-31-46
17,087.94
12-31-47
16,087.94
From 1940 until his marriage in 1942 Joseph lived with his mother. She paid his living expenses during those years. Between 1942 and 1944 Joseph and Marian lived in two different apartments for which they paid $35 and $42 per month rent. In 1944 Joseph purchased a home for $9,000 on which he made a $3,000 down payment. Joseph and Marian lived in this home until 1953. Joseph gave Marian $35 per week for household expenses. Marian had a cleaning woman once a week. During the war years Westerhaus was short of help and Joseph worked long hours in the business. Between 1944 and 1950 Joseph and Marian took no vacations. Joseph was not addicted to gambling and drank only occasionally. Westerhaus furnished Joseph an automobile. During 1940 Joseph received $24,650.51 pay from Westerhaus. He received $18,745.51 by check and $5,905 in cash. Joseph converted $17,693.51 of the checks into currency. During 1941 Joseph received $27,731.63 pay from Westerhaus. *48 He received $24,860.13 by check, $2,834 in cash, and a War Bond in the amount of $37.50. Joseph converted $21,856.65 of the checks into currency. During 1942 Joseph received $36,497.68 from Westerhaus for salary or drawings. He received the entire amount by check, of which he converted $34,660.68 into currency. During 1943 Joseph received $32,575 in drawings from Westerhaus. He received the entire amount by check, of which he converted $31,675 into currency. Joseph borrowed $3,125.20 from his mother to pay his 1940 income taxes and continued in the years 1941 and 1942 to borrow from his mother and repay amounts ranging from $50 to $780. In 1942 Joseph applied for a loan from the Central Trust Company and was turned down by letter, dated May 5, 1942. Joseph, as a partner in Westerhaus and other partnerships, filed with Hamilton County, Ohio, returns of taxable property, in which he listed property and values thereof, as of January 1, 1943, 1944, 1945, and 1946. In each return he reported cash on hand or in safe deposit boxes, as follows: Year
Cash on Hand
1943
$4,264.51
1944
6,019.69
1945
7,564.00
1946
7,329.00
Joseph as an individual filed returns of taxable property in which he listed property *49 and values thereof, as of January 1, 1947, 1948, 1949, 1950, and 1951. In each return he reported no cash on hand or in safe deposit boxes. A safe was maintained in the Westerhaus office to which Joseph had access. At the end of a business day he would often put in the safe the net amounts received from collections that day. During 1945 Joseph made loans to Westerhaus, the total amount of which outstanding on December 31, 1945, was $7,500. In 1946, when Westerhaus was incorporated, Joseph received common stock to offset the above loan. On October 29, 1947, Joseph paid Thomas $5,000 for 142 shares of Westerhaus stock. In 1946 Joseph invested $1,332 in stock of the Royal Distributing Company, Incorporated (herein referred to as Royal), which stock he owned on December 31, 1950. Joseph invested $2,000 in each of the years 1948 and 1949 in stock of the Alpine Amusement Company, Incorporated (herein referred to as Alpine), which stock he owned on December 31, 1950. In 1950 Joseph invested $5,000 in stock of the Ajax Corporation (herein referred to as Ajax). In 1949 Joseph lent $40,500 to Ajax and in 1950 he lent it a net amount of $26,475.40. In 1949 Joseph lent $5,000 to Royal. Joseph *50 filed no income tax returns for the years 1930 through 1935, and 1938. Joseph filed income tax returns for the years 1936 and 1937 and 1939 through 1943, and taxes in the following amounts were paid in reference to those years: Year
Taxes Paid
1936
$ 42.44
1937
42.53
1939
27.92
1940
3,125.21
1941
7,373.38
1942
11,034.92
1943
15,492.71
At the end of the years 1943 through 1950, Joseph's net worth, exclusive of cash on hand, was as follows: 12-31-43
$ 22,658.92
12-31-44
58,150.47
12-31-45
66,366.14
12-31-46
97,225.52
12-31-47
110,362.56
12-31-48
140,233.18
12-31-49
187,928.20
12-31-50
219,469.24 Joseph's gross income, net income, and income tax as reported on his income tax returns for the years 1944 through 1950, were as follows: Year
Gross Income
Net Income
Income Tax
1944
$73,120.61
$68,437.94
$39,180.19
1945
32,765.73
26,799.43
10,178.60
1946
46,741.46
41,779.50
17,885.91
1947
23,520.60
19,529.51
5,429.02
1948
26,104.75
23,776.20
4,479.60
1949
28,913.02
26,970.08
5,532.72
1950
34,463.63
30,097.58
6,898.52
Westerhaus's accountant signed Joseph's tax returns for the years 1944 through 1950 as the person preparing those returns. The Commissioner rejected Joseph's computation of income for the years 1944 through 1950 and recomputed his income by *51 the increase in net worth method. The Commissioner's computation of Joseph's net income for those years based upon increases in net worth plus non-deductible expenditures, is as follows: 1943
1944
1945
1946
Net worth at 12/31
$ 22,658.92
$ 58,150.47
$ 66,366.14
$ 97,225.52
Increases in net worth
$ 35,491.55
$ 8,215.67
$ 30,859.38
Adjustments: Capital gains
(7,630.51)
(7,427.74)
(4,303.15)
Gifts received
(3,000.00)
Salary adjustment
7,400.00
7,400.00
Taxable increase
$ 35,261.04
$ 8,187.93
$ 23,556.23
Plus non-deductible
expenditures: Income tax paid
41,927.43
33,886.86
2,036.54
Insurance premiums
2,151.24
3,805.42
4,727.88
Personal expenditures by
3,632.50
3,532.71
3,876.06
check
Personal expenditures by cash
5,000.00
5,000.00
5,000.00
Net income corrected
$ 87.972.21
$ 54,412.92
$ 39,196.71
1947
1948
1949
1950
Net worth at 12/31
$110,362.56
$140,233.18
$187,928.20
$219,469.24
Increases in net worth
$ 13,137.04
$ 29,870.62
$ 47,695.02
$ 31,541.04
Adjustments: Capital gains
(201.97)
(710.15)
Gifts received
(3,000.00)
(19,087.94)
(8,496.15)
(3,000.00)
Salary adjustment
Taxable increase
$ 9,935.07
$ 10,782.68
$ 39,198.87
$ 27,830.89
Plus non-deductible
expenditures: Income tax paid
12,507.06
4,270.07
5,365.91
5,533.30
Insurance premiums
5,463.63
7,627.81
6,639.50
8,101.61
Personal expenditures by
3,088.30
1,941.26
2,621.31
3,376.08
check
Personal expenditures by cash
5,000.00
5,000.00
5,000.00
5,000.00
Net income corrected
$ 35,994.06
$ 29,621.82
$ 58,825.59
$ 49,841.88
The *52 Commissioner determined the deficiencies and additions to tax for the years 1944 through 1950 on February 9, 1955. Joseph executed timely consent agreements which extended the periods of limitation for the taxable years 1946 and 1947 until June 30, 1955. Each of these consent agreements contained the statement, "This waiver is to have no force or effect in the event it is found 275(c) of the Internal Revenue Code is not applicable * * *." The notice of deficiency which forms the basis for this proceeding was timely with respect to the years 1948, 1949, and 1950 because of waivers executed by Joseph and Marian. Prior to January 1, 1944, Joseph accumulated not less than $65,000 in cash which he kept in a safety deposit box and had on hand at January 1, 1944. Joseph had the following amounts of cash on hand at the end of each of the years 1944 through 1950: 12-31-44
$58,000
12-31-45
45,500
12-31-46
43,000
12-31-47
37,000
12-31-48
35,000
12-31-49
11,000
12-31-50
0
Joseph's personal cash expenditures for the years 19944 through 1946 did not exceed $3,000 per year, and for the years 1947 through 1950 they did not exceed $4,000 per year. No part of the deficiencies in Joseph's income tax for the years *53 1944 through 1950 was due to fraud with intent to evade tax. Joseph's income tax returns for the years 1944 through 1950 were not fraudulent with intent to evade tax. The Commissioner's net worth computation, which we have adjusted, shows that Joseph's net income for 1947 was understated by $9,464.55. Our computation is as follows: Understatement of net income per
Commissioner's computation
$16,464.55
Adjustment for cash on hand at
12-31-46 and 12-31-47
6,000.00
$10,464.55
Adjustment for personal cash ex-
penditures for 1947
1,000.00
Understatement of net income
$ 9,464.55 Joseph claimed deductions in the amount of $16,085.29 on his 1947 tax return. Issue (3). Net Worth - Frances Westerhaus The petitioner in Docket No. 57553 is the Estate of Frances Westerhaus, Deceased, Joseph Westerhaus, Executor. Frances died on November 2, 1953. She filed her individual income tax returns for the years 1945 through 1950 with the collector of internal revenue for the first district of Ohio. Frances and her husband carried on a coin-operated machine business until her husband died in 1934. Subsequent to this Frances carried on the business by herself as a sole proprietor. In 1942 she and her son Joseph Westerhaus, *54 formed a partnership, called the Westerhaus Amusement Company, which they operated until November 1, 1946, when the business was incorporated. Frances received 2,831 shares of Westerhaus stock upon its incorporation. Her cost basis in those shares was $99,877.68. In 1951 Frances sold her interest in Westerhaus to Joseph. Frances operated the business from the basement of her home from 1934 to 1941 when the company changed its location. From 1941 through 1950 she lived in a fourroom apartment over the office. She paid no rent on this apartment. Frances lived a simple life. She did her own housework until 1943, after which she had the service of a cleaning woman once a week. She never owned an automobile and only left her apartment or the business occasionally. Frances took a pleasure trip to Oregon for one week in 1942. This was the only vacation she took between 1940 and 1950. Frances would put in the safe the net amount received from collections each day. The safe contained a petty cash fund which had as much as $9,000 in it at some times. During the war years Westerhaus could not purchase new equipment and its expenditures for other than normal operations were low. In 1945 when *55 manufacturers started to make new equipment Frances began lending money to Westerhaus. In 1945 and 1946 Frances lent $31,000 in cash to Westerhaus. In 1947 she purchased Westerhaus stock from Thomas for $5,000 cash. In 1945 Frances invested more than $10,000 in the Aluminum Aggregate Company. At the end of 1946 she had invested $12,700 in Victory Plating Works, Inc., (herein referred to as Victory) and $1,332 in Royal All of these companies had been formed by Frances and Joseph. In 1948 Frances invested $2,000 in Alpine. She also had a small investment in the Sunnyside Restaurant during 1946, 1947, and 1948. Frances filed no income tax returns for the years 1930 through 1935. Frances filed income tax returns for the years 1936 through 1944, and the following amounts of income tax were paid in reference to those years: Year
Taxes Paid
1936
$ 266.40
1937
114.29
1938
899.83
1939
1,264.09
1940
8,401.50
1941
20,027.49
1942
8,556.79
1943
44,916.98
1944
42,736.28
Frances's returns for all years prior to 1944 had been destroyed by order of the Commissioner before the investigation in this case began. The retained copies of Frances's income tax returns for the years 1936 through 1944 indicate that she reported *56 net income in those years as follows: Net Income
Year
Reported
1936
$ 6,480.42
1937
4,157.17
1938
4,000.84
1939
15,900.99
1940
26,908.43
1941
39,736.29
1942
60,805.38
1943
80,778.22
1944
70,305.98
At the end of the years 1944 through 1950, Frances's net worth, exclusive of cash on hand, was as follows: 12-31-44
$153,157.62
12-31-45
172,555.19
12-31-46
226,796.67
12-31-47
246,780.27
12-31-48
257,724.90
12-31-49
250,172.74
12-31-50
272,144.53 Frances's gross income, net income, and income tax as reported on her income tax returns for the years 1945 through 1950, were as follows: Year
Gross Income
Net Income
Income Tax
1945
$32,852.38
$30,156.96
$12,946.89
1946
37,956.42
35,960.75
15,318.59
1947
25,069.84
24,476.06
9,068.59
1948
29,801.97
28,349.37
10,234.18
1949
23,317.09
21,968.52
7,043.21
1950
25,155.64
23,181.74
7,889.58
Westerhaus's accountant signed Frances's tax returns for the years 1945 through 1950 as the person preparing them. The Commissioner rejected Frances's computation of income for the years 1945, 1946, 1947, 1949, and 1950, and recomputed her income by the increase in net worth method. The Commissioner's computation of Frances's net income for those years based upon increases in net worth plus non-deductible expenditures, is as *57 follows: 1944
1945
1946
1947
Net worth at 12/31
$153,157.62
$172,555.19
$226,796.67
$246,780.27
Increases in net worth
$ 19,397.47
$ 54,241.48
$ 19,983.60
Adjustments: Capital gains
(7,427.33)
(6,489.51)
99.29
Gifts
3,000.00
3,000.00
Salary adjustment
(7,400.00)
Taxable increase
$ 4,570.14
$ 50,751.97
$ 23,082.89
Plus non-deductible
expenditures: Income tax paid
38,665.34
3,027.52
5,909.50
Personal expenditures by
2,165.66
2,813.41
3,190.34
check including insurance
premiums
Personal expenditures by cash
3,000.00
3,000.00
3,000.00
Adjustment of net income
reported in 1948 of
$28,384.37 is correct
Net income corrected
$ 48,401.14
$ 59,592.90
$ 35,182.73
1948
1949
1950
Net worth at 12/31
$257,724.90
$250,172.74
$272,144.53
Increases in net worth
$ 10,944.63
$ (7,552.16)
$ 21,971.79
Adjustments: Capital gains
(6,455.87)
(1,736.80)
Gifts
19,087.94
8,496.15
3,000.00
Salary adjustment
Taxable increase
$ 23,576.70
$ 943.99
$ 23,234.99
Plus non-deductible
expenditures: Income tax paid
2,871.71
12,542.19
8,059.07
Personal expenditures by
2,184.22
3,522.25
4,026.66
check including insurance
premiums
Personal expenditures by cash
3,000.00
3,000.00
3,000.00
Adjustment of net income
(3,283.26)
3,283.26
reported in 1948 of
$28,384.37 is correct
Net income corrected
$ 28,349.37
$ 23,291.69
$ 38,320.72
The *58 Commissioner determined the deficiencies and additions to tax for the years 1945, 1946, 1947, 1949, and 1950, on February 9, 1955. Frances or her executor executed timely consent agreements which extended the periods of limitation for the taxable years 1946 and 1947 until June 30, 1955. Each of these consent agreements contained the statement. "This waiver is to have no force or effect in the event it is found 275(c) of the Internal Revenue Code is not applicable * * *." The notice of deficiency which forms the basis for this proceeding was timely with respect to the years 1949 and 1950 because of waivers executed by Frances or her executor. Prior to January 1, 1945, Frances accumulated not less than $47,000 in cash which she kept in a safety deposit box and had on hand at January 1, 1945. Frances had the following amounts of cash on hand at the end of each of the years 1945 through 1950: 12-31-45
$39,000
12-31-46
25,000
12-31-47
20,000
12-31-48
17,000
12-31-49
13,000
12-31-50
2,000
Frances's personal cash expenditures for the years 1945 through 1950 did not exceed $1,500 per year. No part of the deficiencies in Frances's income tax for the years 1945, 1946, 1947, and 1950 was due to fraud with *59 intent to evade tax. Frances's income tax returns for the years 1945, 1946, 1947, and 1950 were not fraudulent with intent to evade tax. The Commissioner's net worth computation, which we have adjusted, shows that Frances's net income for 1946 and 1947 was understated by $8,132.15 and $4,206.67, respectively Our computations are as follows: 1946
1947
Understatement of net in-
come per Commissioner's
computation
$23,632.15
$10,706.67
Adjustment for cash on
hand at 12-31-45, 12-31-46,
and 12-31-47
14,000.00
5,000.00
$ 9,632.15
$ 5,706.67
Adjustment for personal
cash expenditures
1,500.00
1,500.00
Understatement of net in-
come
$ 8,132.15
$ 4,206.67 Issue (4). Sales Promotion Expenses - Thomas Jackson Thomas claimed deductions for "Sales Promotion Expense" on his tax returns for the years 1947 through 1950, as follows: Sales Promo-
Year
tion Expense
1947
$6,899.91
1948
5,491.20
1949
4,662.23
1950
4,666.67
Thomas had no cancelled checks to support the above-mentioned deductions. He did have expense books which showed in detail the place, amount, and date of each expenditure during those years. The Commissioner determined that Thomas was entitled to a deduction of only $500 for sales promotion expenses in each of the *60 years 1947 through 1950. He also made additions to the tax for fraud and substantial underestimation of estimated tax for those years. The Commissioner determined the deficiencies and additions to tax for the years 1947 through 1950 on February 9, 1955. Thomas, or Thomas and Celia, executed timely consent agreements which extended the periods of limitation for the taxable years 1947 and 1948 until June 30, 1955. Each of these consent agreements contained the statement, "This waiver is to have no force or effect in the event it is found 275(c) of the Internal Revenue Code is not applicable * * *." The notice of deficiency which forms the basis for this proceeding was timely with respect to the years 1949 and 1950 because of waivers executed by Thomas and Celia. Thomas spent not less than $2,000 for "Sales Promotion Expenses" in each of the years 1947 through 1950. No part of the deficiencies in Thomas's income tax for the years 1947 through 1950 was due to fraud with intent to evade tax. Thomas's income tax returns for the years 1947 through 1950 were not fraudulent with intent to evade tax. Issue (5). Miscellaneous Business Expenses - Westerhaus Company The petitioner in Docket Nos. *61 57554 and 59557 is the Westerhaus Company, a corporation formed on November 1, 1946. Westerhaus filed corporation income tax returns for the taxable period 1946, for the years 1947 through 1952, and for the taxable period 1953, with the collector of internal revenue for the first district of Ohio. Westerhaus owned pin ball machines, slot machines, music boxes, and other types of coin-operated devices. These machines were distributed in various cafes, restaurants, and taverns throughout the States of Ohio, Indiana, and Kentucky. About once a week a representative from Westerhaus visited each location, opened the machine's coin box with a key and counted its contents. By agreement, the owner of the location and Westerhaus were to split the profits of the machine evenly. During the taxable years or periods Joseph allegedly incurred entertainment, Christmas, and picnic expenses on behalf of Westerhaus, as follows: Year or
Enter-
Taxable
tainment
Christmas
Picnic
Period
Expenses
Expenses
Expenses
1946
$ 440.50
$1,191.80
1947
5,364.27
3,819.50
$2,122.90
1948
6,502.00
7,812.50
1,799.50
1949
4,462.12
3,956.20
1,193.00
1950
4,866.22
8,400.25
1,979.50
1951
5,023.50
4,200.00
1,451.00
1952
4,228.80
8,170.00
1953
2,229.00
Westerhaus *62 reimbursed Joseph for such expenses and deducted those amounts as ordinary and necessary business expenses. The Commissioner disallowed such deductions in their entirety. The Commissioner disallowed certain travel expenses claimed by Westerhaus, for the years 1947 through 1949, and 1951, as follows: Travel
Travel
Expenses
Expenses
Year
Claimed
Disallowed
1947
$ 589.24
$473.00
1948
998.55
446.45
1949
1,756.73
176.00
1951
1,582.40
334.77 The Commissioner determined the deficiencies and additions to tax for the years 1946 through 1950 on February 9, 1955. Westerhaus, by its duly authorized representatives, executed timely consent agreements which extended the periods of limitation for the taxable period 1946 and for the taxable year 1947 until June 30, 1955. Each of these consent agreements contained the statement, "This waiver is to have no force or effect in the event it is found section 275(c) of the Internal Revenue Code is not applicable. * * *" The notice of deficiency which forms the basis for this proceeding was timely with respect to the years 1948, 1949, and 1950, because of waivers executed by Westerhaus, through its authorized representatives. Joseph incurred entertainment and picnic expenses *63 on behalf of Westerhaus during the taxable years or periods in not less than the following amounts: Year or Tax-
Entertainment
Picnic
able Period
Expenses
Expenses
1948
$3,000
$500
1949
2,000
500
1950
2,000
500
1951
2,000
500
1952
2,000
1953
1,000 Westerhaus reimbursed Joseph for such expenditures and it is entitled to deductions therefor. No part of the deficiencies in Westerhaus's income tax for the taxable period 1946 and the years 1947 through 1950 was due to fraud with intent to evade tax. Westerhaus's income tax returns for the taxable period 1946 and the years 1947 through 1950 were not fraudulent with intent to evade tax. Issue (6). Miscellaneous Business Expenses - Joseph Westerhaus The amounts of Westerhau's entertainment, Christmas, and picnic expenses disallowed by the Commissioner for the years 1951, 1952, and the taxable period 1953, represented amounts paid to Joseph in cash in reimbursement of expenses allegedly incurred by him on Westerhaus's behalf. The Commissioner determined that those amounts constituted taxable dividends to Joseph. Westerhaus's payments to Joseph were in reimbursement of its entertainment expenses paid by Joseph in the amounts of $2,000 in each of the years 1951 *64 and 1952, and $1,000 in 1953. Westerhaus's payments to Joseph were in reimbursement of its picnic expenses paid by Joseph in the amount of $500 in 1951. Issue (7). Claimed Loss of Coin-Operated Machines and Starter Money Westerhaus kept detailed records of "losses" of pinball machines and other equipment which were "confiscated" by the police, stolen, or destroyed by fire. The following schedule shows the losses claimed by Westerhaus resulting from the above-mentioned items, for the taxable period 1946, the years 1947 through 1952, and the taxable period 1953: Unrecovered Cost of Machines
Year or
Taxable
Destroyed
Period
Confiscated
Stolen
by Fire
1946
$ 20.00
$ 81.00
1947
14,058.99
183.41
$266.96
1948
7,419.95
1,221.91
1949
7,965.44
2,291.58
1950
5,676.18
73.73
1951
2,042.41
30.00
1952
10.00
20.00
1953
1,114.47
On its tax returns for the taxable period 1946, the years 1947 through 1952, and the taxable period 1953, Westerhaus deducted as capital losses the totals of the abovementioned amounts under the capitions "confiscated" or "confiscated or stolen" equipment. The Commissioner disallowed those deductions. The disallowance for the taxable period 1946 and the years 1947 through 1950 was explained in the notice *65 of deficiency as follows: "It is held that you are not entitled to deduct the unrecovered cost of coin-operated machines that had been confiscated as a capital loss under section 117(j), or as a loss under section 23(f) of the Internal Revenue Code of 1939 in the amount of * * * as claimed on your return." The disallowance for the years 1951 and 1952 and the taxable period 1953 was explained in the notice of deficiency as follows: "It has been determined that claimed deduction of * * * representing adjusted cost basis of pinball machines confiscated by the police as gambling devices, is not an allowable deduction since it has not been established that this represents an ordinary and necessary business expense of doing business." Westerhaus also claimed deductions for "Starter Money Confiscated" in the amounts of $326.25, $141, and $627.85 for the years 1947, 1948, and 1949, respectively. The Commissioner disallowed those deductions. The disallowance was explained in the notice of deficiency as follows: "It is held that you are not entitled to deduct starter money confiscated along with coin-operated machines as a loss under sections 23(a) and/or 23(f) of the Internal Revenue Code of 1939 *66 in the amount of * * * as claimed on your return." Issue (8). Stock Sales of Wholly Owned Corporations On December 30, 1951, Joseph transferred 205 shares of Westerhaus stock to Hilbe, Inc. (herein referred to as Hilbe), an Indiana corporation, and received $15,243.80 therefor. At the time of sale Joseph owned all of the outstanding stock of Hilbe and Hilbe had an accumulation of earnings in excess of $15,243.80. Joseph used the proceeds to pay a debt owed to Hilbe. Joseph had acquired the 205 shares of Westerhaus stock from Frances on September 29, 1951, for $15,243.80. On his tax return for 1951, Joseph reported no gain or loss as a result of the sale of the Westerhaus stock to Hilbe. On December 29, 1952, Joseph transferred 51 shares of Victory stock to Westerhaus and received $19,545.24 therefor. At that time Joseph owned all of the outstanding stock of Victory and also owned, directly or indirectly, all of the outstanding stock of Westerhaus. Victory had an accumulation of earnings in excess of $19,545.24 at the time of sale. Joseph had acquired the 51 shares of Victory stock on June 29, 1950, at a cost of $12,047.22. On his tax return for 1952, Joseph reported a long-term capital *67 gain of $7,539.78 as a result of the sale of the Victory stock to Westerhaus. On December 31, 1952, Joseph transferred 356 shares of Westerhaus stock to Hilbe and received therefor $29,298.80. At that time Joseph owned, directly or indirectly, all of the outstanding stock of both Westerhaus and Hilbe. Hilbe had an accumulation of earnings in excess of $29,280.80 at that time. Joseph used the proceeds to pay a debt owed to Hilbe. Joseph had acquired the 356 shares of Westerhaus stock on September 29, 1951, at a cost of $26,472.16. On his tax return for 1952, Joseph reported a long-term capital gain of $2,826.64 as a result of the sale of the Westerhaus stock to Hilbe. On December 31, 1953, Joseph transferred 499 shares of Westerhaus stock to Hilbe and received $24,950 therefor. At that time Joseph owned, directly or indirectly, all of the outstanding stock of both Westerhaus and Hilbe. Hilbe had an accumulation of earnings in excess of $24,950 at that time. Joseph had acquired the 499 shares of Westerhaus stock on September 23, 1953, at a cost of $24,950. On his tax return for 1953, Joseph reported no gain or loss as a result of the sale of the Westerhaus stock to Hilbe. In each of *68 the foregoing stock transactions, a new certificate of stock was duly issued and the proper revenue stamps were attached to the stub of the stock certificate books of the respective companies. Joseph's accountant took care of all of the details of the above transactions. The sales in each instance were at the current book values of the stock. Joseph did not try to sell the stock to anyone else. The amounts received by Joseph as a result of the stock sales do not constitute dividends to him, but represent the proceeds of a sale taxable to him as capital gains. Opinion Issues (1), (2), and (3). Net Worth - Thomas Jackson, Joseph and Frances Westerhaus The Commissioner's computation of the net income of Thomas, Joseph and Frances, computed by the increase in net worth method, shows that they understated their net income during the taxable years, as follows: Year
Amount
Thomas
1944
$ 21,360.25
1945
5,542.30
1946
10,396.06
Total
$ 37,298.61
Joseph
1944
$ 19,534.27
1945
27,613.49
1946
(2,582.79)
1947
16,464.55
1948
5,845.62
1949
31,855.51
1950
19,744.30
Total
$118,474.95
Frances
1945
$ 18,244.18
1946
23,632.15
1947
10,706.67
1949
1,323.17
1950
15,138.98
Total
$ 69,045.15
The Commissioner's determination is prima facie correct *69 and the burden of proving error therein is upon the taxpayers. Thomas v. Commissioner, 223 Fed. (2d) 83 (C.A. 6, 1955). Thomas, Joseph, and Frances contend that the essentials of a net worth case were not established as to them. They argue that the Commissioner failed to establish with reasonable certainty an opening net worth to serve as a starting point from which to calculate future increases in their assets. They also argue that the Commissioner failed to show that their increases in net worth were attributable to currently taxable income. Thomas, Joseph and Frances are in agreement with the Commissioner's net worth statements, except for two items, namely, cash on hand at the beginning of the net worth periods and at the beginning of each of the taxable years and their personal cash expenditures during such taxable year. The tax returns of Thomas, Joseph and Frances for all years prior to 1944 had been destroyed by the Commissioner. He therefore began his net worth determinations as of January 1, 1944, or subsequent thereto. In each case, except as shown below, no allowance was made for cash on hand (as opposed to cash on deposit) in the opening net worth or at the beginning *70 of any of the years in the net worth period. The Commissioner explained that the attorney for petitioners would not allow them to talk to the examining agents and thus it could not be established through direct examination whether they had any cash on hand. However, the Commissioner did have the Taxable Property returns which were filed with Hamilton County by Thomas, Joseph, and Frances as individuals or by Joseph as a partner with Frances in Westerhaus and other partnerships. Thomas reported no cash on hand or in safety deposit boxes as of January 1, 1944, 1945, 1946, and 1947, and the Commissioner used that in determining Thomas's cash on hand during the net worth period. Joseph, as a partner with Frances, reported $6,019.69, $7,564, and $7,329 on hand at January 1, 1944, 1945, and 1946, respectively, which were the amounts that Westerhaus had in its petty cash fund at those dates. Credit for these amounts was given to Joseph and Frances in the net worth determination under their equities in the partnership. Joseph and Frances, as individuals, reported no cash on hand or in safety deposit boxes as of January 1, 1947, 1948, 1949, 1950, and 1951, and the Commissioner used that information *71 in determining their cash on hand during the net worth periods. The net worth determinations in regard to Thomas, Joseph, and Frances will hereafter be discussed individually. Thomas Thomas owned approximately $78,000 in assets, exclusive of cash on hand, at the beginning of 1944. It was stipulated that more than $52,000 of these assets were acquired prior to 1942. In 1942 and 1943 Thomas's net income, after taxes, was approximately $54,000; yet the Commissioner's net worth statement only shows an increase of about $26,000 ($78,000 less $52,000) in assets in those two years. There is no explanation of how Thomas might have disposed of the $28,000 difference if he did not accumulate it as claimed. The record discloses that Thomas lived frugally both before and during the taxable years. Also it was shown that Thomas converted many of his pay checks into cash. There are other factors which convince us that Thomas had a sizeable amount of cash on hand at December 31, 1943. For instance, in 1944 Thomas invested over $43,000 in the Fox & Crow Club and related companies; yet his net income after taxes that year was only about $22,000. Logically, the difference of $21,000 either was on hand *72 at the beginning of 1944 or was unreported income. The record convinces us that it must have been on hand. There was no showing that the increases in Thomas's net worth that year were attributable to currently taxable income; there was only an intimation by the Commissioner that Thomas overstated his sales promotion expenses - but Thomas's total deduction for those expenses was only $4,695 in 1944. After a careful consideration of the record, we have made a finding that Thomas accumulated not less than $28,000 in cash which he kept in a safety deposit box and had on hand at January 1, 1944. The Commissioner computed Thomas's cash expenditures for the years 1944 through 1946 from the amounts which he deducted on his tax returns for payment of the 3 per cent Ohio Sales Tax during those years. Although this method of computing personal expenditures may be justified because of Thomas's refusal to talk to the examining agents, we think that it was inaccurate in this case. Thomas has shown that his personal expenditures were considerably less than estimated by the Commissioner. We have therefore found as a fact that his personal expenditures for the years 1944 and 1945 did not exceed $3,000 *73 per year and that in 1946 they did not exceed $4,500. In view of our findings, there are no deficiencies in income tax for the years 1944 through 1946. This renders moot the questions in regard to the additions to tax for fraud and for substantial understimate of estimated tax. Joseph The Commissioner contends that the record does not support Joseph's claim that he had a large amount of cash on hand at January 1, 1944. He argues that if Joseph was accumulating large amounts of cash in the early 1940's, he would not have borrowed amounts ranging from $50 to $780 from his mother during the years 1940 to 1942 and he would not have tried to borrow money from the Central Trust Company in 1942. During the years 1940 through 1943 Joseph received approximately $121,000 from Westerhaus in salary and drawings, of which he converted more than $114,000 into cash. He paid income tax of about $37,000 during those years. His salary and drawings, less taxes paid, thus amounted to about $84,000 during that period; yet the Commissioner only credits Joseph with an opening net worth of about $22,000. There is no explanation of how Joseph might have disposed of the $62,000 difference, if he didn't accumulate *74 it as claimed. Joseph lived frugally both during the net worth period and prior to it. During the war years he was forced to work long hours for Westerhaus because of the man-power shortage. Joseph explained that he lived with his mother from 1940 to 1942, and during that time he would borrow from her rather than make frequent trips to his safety deposit box, and then repay the loan on his next payday. Joseph admitted that he received a letter from the Central Trust Company turning him down on a loan in 1942, but he did not remember any of the details surrounding the proposed loan. Joseph testified that Westerhaus's accountant filled out his local Taxable Property returns for him and that he signed them without paying any attention to what was on the returns. That Joseph borrowed small amounts of money from his mother from 1940 to 1942, and that a bank turned him down on a loan in 1942, do not necessarily show that he did not have a large amount of cash in a safety deposit box. The close business, personal, and family relationship between Joseph and his mother supports Joseph's explanation of his borrowings from her. The alleged inconsistency arising from the bank's unexplained refusal *75 to lend money to Joseph in 1942 together with the failure to report in full his cash hoard to the state taxing officials have been weighed along with the rest of the record. We think that the record taken as a whole establishes that Joseph had a substantial amount of cash on hand at the beginning of the net worth period and at the end of each of the net worth years, except the last one. As to the latter time, Joseph testified that he had used up all of his accumulated cash by about 1950 or 1951. Accordingly, we have made the best approximation we can on the evidence before us, and have found that Joseph had cash on hand in the amount of $65,000 at January 1, 1944; that he had cash on hand at the end of each of the years 1944 through 1949, in the respective amounts of $58,000, $45,500, $43,000, $37,000, $35,000, and $11,000; and that he had no cash on hand at the end of the year 1950. Harry Gleis, 24 T.C. 941, affd. per curiam 245 Fed. (2d) 237 (C.A. 6, 1957). The record shows that Joseph's personal cash expenditures during the taxable years were less than estimated by the Commissioner, and, therefore, we have made a finding that his personal cash expenditures for the years 1944 *76 through 1946 did not exceed $3,000 per year, and that in the years 1947 through 1950 they did not exceed $4,000 per year. Our findings of fact with regard to cash on hand and personal cash expenditures, however, still leave substantial unaccounted for increases in Joseph's net worth during the taxable years. The Commissioner contends that these increases arose from unreported income. He alleges that the source of the unreported income was Joseph's withdrawals of money from Westerhaus to pay its expenses, which he did not so pay but converted instead to his own use. He also alleges that some of the unreported income came from Westerhaus's payment of Joseph's personal expenditures, such as automobile expenses. In view of the testimony of the examining agents, various restaurant and tavern owners, and other witnesses, we think that the Commissioner has shown a source of currently taxable income from which Joseph's net worth increases (after our adjustments) reasonably could have come. On the other hand, Joseph has not shown that the unaccounted for increases in net worth did not come from unreported income. See Carmack v. Commissioner, 183 Fed. (2d) 1 (C.A. 5, 1950), affirming a Memorandum *77 Opinion [8 TCM,] of this Court, where the Court of Appeals said: "If the increase in taxpayer's net worth during the tax year involved was not actually attributable to unreported income, it was incumbent upon him to establish that fact by some competent and satisfactory evidence." We therefore approve the deficiencies which result from the increases in net worth as computed by the Commissioner and adjusted by us. The Commissioner determined that Joseph is liable for an addition to tax for fraud, as provided in section 293(b), for all of the years during the net worth period. The burden of proving fraud is with the Commissioner and that burden requires him to show by clear and convincing evidence that at least part of the deficiencies is due to fraud with intent to evade tax. The Commissioner contends that Joseph's attempt to evade and defeat his income taxes may be inferred from his refusal to talk to the examining agents; his continued dealings in cash, thus avoiding records which could be traced; his large unexplained increases in net worth during the taxable years; and the inability of the examining agents to substantiate the various promotion expenses he allegedly incurred on behalf *78 of Westerhaus during the taxable years. The Commissioner has failed to carry his burden. Joseph's refusal to talk to the examing agents and his continued dealings in cash do not show fraud. That Joseph's income has been held to have been understated (as a result of his increases in net worth) does not, standing alone, establish fraud. L. Glenn Switzer, 20 T.C. 759 (1953). There must be other factors in the record showing that the understatement is fraudulent. We think the record here lacks such factors. The testimony of the various witnesses introduced by the Commissioner to show that Joseph withdrew money from Westerhaus to pay its expenses which he did not pay, indicates that it was possible for Joseph to have received unreported income from that source. However, it does not convince us that he actually received such unreported income or that if in fact he received such unreported income, that his failure to report it was fraudulent with intent to evade tax. We hold that the Commissioner has not shown by clear and convincing evidence that part of the deficiencies during the taxable years was due to fraud with intent to evade tax. The Commissioner determined the deficiencies and *79 additions to tax for the years 1944 through 1950 on February 9, 1955. Joseph executed waivers extending the statute of limitations for the years 1946 and 1947 if, and only if, section 275(c)[3] was found applicable. The notice of deficiency with respect to the years 1948 through 1950 was stipulated to be timely. Joseph, relying on section 275(a), [4] contends, however, that the deficiencies for the years 1944 through 1947 are barred. For the reasons stated above, we hold that none of Joseph's returns for the net worth years was fraudulent with intent to evade tax, and since no consents were filed, it follows that the deficiencies for the years 1944 and 1945 are barred by the statute of limitations. The deficiencies for *80 1946 and 1947 also are barred by the statute of limitations unless the Commissioner shows that section 275(c) applies. To do this, he must show that Joseph omitted from gross income an amount in excess of 25 per cent of the amount of gross income stated in his returns for those years. C. A. Reis, 1 T.C. 9 (1942). And such omission of 25 per cent must result from omitted gross income rather than from excessive deductions. H. A. Hurley, 22 T.C. 1256, affd. on another point, 233 Fed. (2d) 177 (C.A. 6, 1956); David Courtney, 28 T.C. 658. It is clear that the deficiency for 1946 is barred by the statute of limitations, since the Commissioner's own adjusted computation, which has not been materially altered by our findings, shows that Joseph's income was not understated for that year and thus section 275(c) can have no application. As for 1947, Joseph reported gross income on his tax return that year in the amount *81 of $23,520.60 - 25 per cent of which is $5,880.15. Joseph's understatement of net income for 1947 ($9,464.55) clearly exceeds 25 per cent of the gross income reported by him that year. However, we are unable to tell from the record whether this understatement of net income was a result of omissions from gross income or excessive deductions. It is possible that the understatement of net income resulted from the latter since Joseph claimed deductions of $16,085.29 on his 1947 tax return, which deductions may have been excessive in amount. At least the Commissioner has failed to show otherwise. We hold that the Commissioner has not shown that Joseph's understatement of net income for 1947 resulted from omissions of gross income. H. A. Hurley, supra; David Courtney, supra.The deficiency in income taxes for 1947 is therefore barred by the statute of limitations. The Commissioner also made additions to the tax under section 294(d)(2) for substantial underestimate of estimated tax for the years 1944, 1945, 1947, 1949, and 1950. Such additions for 1944, 1945, and 1947 are barred by the statute of limitations. Section 294(d)(2) provides for an addition to the tax in the event 80 per cent *82 of the correct tax liability exceeds the estimated tax. The statute does not provide for any extenuating circumstances. H. R. Smith, 20 T.C. 663 (1953). Joseph's correct tax liability for the years 1949 and 1950 will will be computed under Rule 50 in accordance with this opinion, and at that time it can be determined whether 80 per cent of the tax so computed exceeds the estimated tax. If so, it will be proper to make additions thereto for substantial underestimate of estimated tax. Frances The Commissioner contends that Frances did not have a large amount of cash hidden away and on hand at the beginning of 1945. He bases his contention on the fact that Frances's maximum net income, after taxes, for the years 1930 through 1944 was only about $189,000, and in his computation he gave her credit for an opening net worth of approximately $153,000. He argues that the difference of $36,000 would give her about $2,400 per year to live on during the 15-year period. Thus Frances would not have been able to accumulate any substantial amount of cash during that period unless she substantially understated her income during those years. The Commissioner's argument is general. It does not wholly *83 correspond with the facts of this case. During the years 1942 through 1944, Frances's net income, after taxes, was approximately $115,000. Westerhaus's accountant reconstructed her cash receipts and disbursements from her records and the records of Westerhaus. His computation showed that not counting personal cash expenditures she could have accumulated over $52,000 in cash during those years. The Commissioner's argument does not take into account the fact that Frances received some of Westerhaus's assets at her husband's death in 1934, as well as other property. Also, between 1936 and 1944 Frances's net income, after taxes, was over $182,000. And during all those years her living expenses were at a minimum, i.e., she lived in an apartment over the business, did not have a car, and did not go out much. She took but one vacation, and that one short. Joseph testified that he and Frances accumulated cash during the war which they used to purchase new equipment after the war and which they also invested in several companies formed by them subsequent to the war. The Commissioner was unable to point to any specific receipt of income by Frances which she did not report in her tax returns, *84 though he intimated that Westerhaus was a possible source of taxable income which would account for her net worth increases. Since the Commissioner rests his case solely on inferences derived from net worth computations, and since the record presents no evidence of a likely source of currently taxable income, Frances's cash hoard story gains credence. We think the record establishes that Frances had a substantial amount of cash on hand at the beginning of the net worth period and at the end of each of the net worth years, except the last one. As for that time, Joseph testified that Frances (who shared a safe deposit box with him) had used up about all of her cash in the investments in companies formed by them. We have therefore made the best approximation we can on the evidence before us and have found that Frances had cash on hand in the amount of $47,000 at January 1, 1945, and that she had cash on hand at the end of the years 1945 through 1950 in the respective amounts of $39,000, $25,000, $20,000, $17,000, $13,000, and $2,000. Harry Gleis, supra. The record clearly shows that Frances's personal cash expenditures during the net worth years were considerably less than estimated *85 by the Commissioner and we have therefore found as a fact that such expenditures for the years 1945 through 1950 did not exceed $1,500 per year. Our findings of fact with regard to cash on hand and personal cash expenditures still leave unaccounted for increases in Frances's net worth during the taxable years. There is a presumption that the deficiencies as determined by the Commissioner are correct. The burden is on petitioners to overcome this presumption. Except to the extent that our adjustments to the Commissioner's determination may result in lesser deficiencies the petitioners have not carried their burden. We therefore sustain the Commissioner's determination subject to our adjustments. Rogers v. Commissioner, ( C.A. 7, October 21, 1957), - Fed. (2d) , affirming a Memorandum Opinion [15 TCM 890; T.C. Memo. 1956-171] of this Court. The Commissioner determined that Frances was liable for additions to tax for fraud under section 293(b) for all of the years in the net worth period for which deficiencies in income tax were determined. On brief it was conceded that such addition to tax for the year 1949 was improper. The Commissioner relies primarily upon the fact that his net *86 worth statement shows that Frances's net income was substantially understated during the net worth years, thus revealing a pattern of understatement and concealment of net income. The Commissioner also argues that fraud may be incash which left no traceable records and from her refusal to talk to the examining agents. We think the Commissioner has failed to prove fraud. His suspicions of fraud do not prove fraud, Nicholas Roerich, 38 B.T.A. 567, affd. 115 Fed. (2d) 39 (C.A. D.C. 1940), certiorari denied, 312 U.S. 700, and the mere understatement of taxable income does not establish fraud, L. Glenn Switzer, supra. The record considered as a whole does not support the Commissioner's fraud charge and we therefore decide this issue in Frances's favor. The Commissioner determined the deficiencies and additions to tax for the years 1945, 1946, 1947, 1949, and 1950, on February 9, 1955. Frances executed waivers extending the statute of limitations for the years 1946 and 1947 if, and only if, section 275(c) was found applicable. The notice of deficiency with respect to the years 1949 and 1950 was stipulated to be timely. It is contended that the deficiencies for the years 1945, 1946, *87 and 1947 are barred by section 275(a). We agree. For the same reasons as stated above, we hold that none of Frances's tax returns for the net worth years was fraudulent with intent to evade tax. Since Frances did not file a consent extending the statute of limitations for the year 1945, it follows that the deficiency for that year is barred by the statute of limitations. The deficiencies for 1946 and 1947 also are barred by the statute of limitations unless section 275(c) applies. That section extends the statute of limitations from 3 to 5 years if the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return. Here, Frances reported gross income on her 1946 and 1947 tax returns in the respective amounts of $37,956.42 and $25,069.84, and 25 per cent of those amounts is $9,489.11 and $6,267.46, respectively. However, Frances's understatement of net income for 1946 is only $8,132.15 and for 1947 it is only $4,206.67. These amounts are less than 25 per cent of the gross income reported for those years. Therefore section 275(c) does not apply and the deficiencies for 1946 and 1947 are barred *88 by the statute of limitations. The Commissioner also made additions to the tax under section 294(d)(2) for substantial underestimate of estimated tax for the years 1946, 1947, and 1950. Such additions for 1946 and 1947 are, of course, barred by the statute of limitations. The addition to tax for 1950 will be proper if 80 per cent of the correct tax liability exceeds the estimated tax. Frances's correct tax liability for 1950 will be computed under Rule 50 in accordance with this opinion and at that time it can be determined whether an addition to tax should be made under section 294(d)(2). Issue (4). Sales Promotion Expenses - Thomas Jackson On his tax returns for the years 1947 through 1950, Thomas deducted the respective amounts of $6,899.91, $5,491.20, $4,662.23, and $4,666.67, for sales promotion expenses. On the returns for 1948, 1949, and 1950, he listed the date, amount, and location where he allegedly incurred the expenses he deducted. Two revenue agents contacted about 20 per cent of the approximately 300 locations listed by Thomas on the tax returns, but were unable to substantiate the claimed deductions to their satisfaction. The Commissioner therefore disallowed all except *89 $500 of each of the above claimed deductions. The Commissioner called as witnesses at the hearing of this case, 5 of the cafe and tavern owners interviewed by the revenue agents. Two of them testified that they knew Thomas, but that he never came into their places of business. Two others testified that they didn't know Thomas, and when he was pointed out to them, they testified that he never came into their places of business. The fifth witness surprised counsel for the Commissioner by testifying that he knew Thomas and that the latter did come into his bar occasionally and bought the boys a drink. On cross examination, all four of the witnesses who testified that Thomas made no expenditures at their places of business admitted that they only worked during part of the day and that they didn't know whether Thomas came in during their off-hours and spent money in their establishments at some time when they were not present. The burden of proving error in the Commissioner's determination is, of course, upon Thomas. The notebooks in which a detailed record of his alleged expenditures were kept were introduced into evidence, but no checks, receipts, or other documentary evidence was submitted. *90 Eleven witnesses testified on his behalf. The witnesses either owned or worked in taverns and cafes or helped with the organization of picnics at which Westerhaus equipment was used. Their testimony was general in nature. It was to the effect that they knew Thomas, saw him in their taverns or cafes frequently or at all of the picnics, and that he bought drinks for the house when he visited the taverns and cafes, or that he spent considerable amounts entertaining people at the picnics. The record convinces us that Thomas incurred substantial sales promotion expenses during the taxable years. The evidence presented by the Commissioner raised doubt as to whether Thomas spent as much on sales promotion expenses as he claimed on his tax returns, and the evidence presented by Thomas has not entitrely removed that doubt. However, we think it has been shown that Thomas spent more than the $500 per year allowed him by the Commissioner. We have therefore resorted to the principle of Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930), and have concluded that Thomas spent not less than $2,000 for sales promotion expenses during each of the years 1947 through 1950. The Commissioner determined *91 that Thomas's understatement of net income for the years 1947 through 1950 was the result of Thomas's knowingly overstating his sales promotion expenses and the Commissioner has therefore made additions to the tax for fraud for those years. We think that the Commissioner has failed to carry his burden of showing that the alleged overstatement of sales promotion expenses was due to fraud with intent to evade tax. The testimony of the Commissioner's witnesses fails to convince us that Thomas did not incur any sales promotion expenses as their locations during the taxable years. These witnesses all admitted that they only worked part of the day, such as the morning or afternoon, and were not continuously at their locations. The Commissioner has not shown that Thomas fraudulently "padded" his sales promotion expense deductions. We hold that no part of the deficiencies in Thomas's income tax for the years 1947 through 1950 was due to fraud with intent to evade tax. For the same reasons, we hold that Thomas's returns for the years 1947 through 1950 were not fraudulent with intent to evade tax. Nevertheless we must decide whether the bar of the statute of limitations has been otherwise lifted *92 with respect to the deficiencies for 1947 and 1948. It is stipulated that the waivers for those years are to have no force and effect unless section 275(c) applies. And it is clear that that section can have no application here, since Thomas's understatement of net income, as determined by the Commissioner, resulted from excessive deductions and not from the omission of gross income. H. A. Hurley, supra.It follows that the deficiencies in Thomas's income tax for 1947 and 1948 are barred by the statute of limitations. The addition to tax for 1947 for substantial underestimate of estimated tax is also barred. Issue (5). Miscellaneous Business Expenses - Westerhaus Company Joseph allegedly incurred entertainment, Christmas, and picnic expenses on behalf of Westerhaus, during some or all of the taxable period 1946, the years 1947 through 1952, and the taxable period 1953, for which Joseph received reimbursements in cash from Westerhaus. Westerhaus deducted these amounts on its tax returns as ordinary and necessary business expenses. The Commissioner disallowed these amounts in their entirety because of lack of substantiation. Our Findings of Fact detail the amounts of the deductions *93 disallowed by the Commissioner. To show error in the Commissioner's determination, in so far as the disallowance of entertainment and picnic expenses are concerned, Westerhaus used the same method as Thomas in Issue (4). Namely, a group of witnesses, 13 in number, who owned or worked in taverns and cafes or helped with the organization of picnics at which Westerhaus equipment was used, testified generally that they knew Joseph, saw him in their taverns and cafes or at the picnics, and that he bought drinks for the house when he visited the taverns and cafes, or that he spent considerable amounts entertaining people at the picnics. The record convinces us that Joseph incurred substantial entertainment and picnic expenses on behalf of Westerhaus. Since, however, we are unable to determine from the record the exact amount of Joseph's expenditures, we have resorted to the Cohan principle and concluded that he incurred entertainment expenses on behalf of Westerhaus, for which it is entitled to deductions, in the following amounts: $3,000 in 1948, $2,000 in each of the years 1949 through 1952, and $1,000 in the taxable period 1953; and that he incurred picnic expenses on behalf of Westerhaus, *94 for which it is entitled to deductions, in the following amounts: $500 in each of the years 1948 through 1951. The only evidence presented to show that Joseph incurred Christmas expenses (cash bonuses to employees, etc.) on behalf of Westerhaus, was the self-serving testimony of Joseph, which was general in nature, the testimony of one of Westerhaus's secretaries who stated generally that over a five or six-year period she took cash out of the petty cash fund, placed it in envelopes and gave it to Joseph who signed a petty cash ticket for it, and the testimony of Westerhaus's accountant that Westerhaus had available the petty cash vouchers for Christmas expense for the years 1951, 1952 and the taxable period 1953. However, the petty cash vouchers were not introduced in evidence. We think that Westerhaus has failed to sustain its burden of showing that the Commissioner erred in disallowing certain Christmas expenses during the taxable period 1946 and the years 1947 through 1952. The Commissioner disallowed certain travel expenses deducted by Westerhaus on its tax returns for the years 1947 through 1949, and 1951, for lack of substantiation. Our Findings of Fact detail the amount of *95 the traveling expense deductions claimed by Westerhaus and the amounts disallowed by the Commissioner. Joseph testified that the travel expense deductions for 1947, 1948 and 1949, were for company business and that receipts for travel expenses were always obtained and turned in to Westerhaus. Westerhaus's accountant testified that the travel expenses for 1947, 1948 and 1949, were reimbursed from the petty cash fund and that there were petty cash vouchers available for each reimbursement. Three of the vouchers were referred to in detail. However there was no showing that these vouchers represented travel expenses which had been disallowed by the Commissioner. We hold that Westerhaus has failed to show that the Commissioner erred in disallowing certain travel expenses for the years 1947 through 1949, and 1951. The Commissioner determined that at least a part of the deficiencies for the taxable period 1946 and for each of the years 1947 through 1950 was due to fraud with intent to evade tax. He relies mainly on the results of an investigation conducted by two of his agents. One of the agents testified that the reimbursement slips submitted by Joseph to Westerhaus were used to prepare *96 a list of the locations where Joseph allegedly incurred entertainment expenses, that approximately 20 per cent of those locations were visited in an attempt to substantiate the claimed expenses, and that as a result of their investigation they found that about 80 per cent of those interviewed either did not know Joseph, or that if they did know him they sa9d he didn't come into their places of business and spend money there. No witnesses were called by the Commissioner to support the testimony of the agent, as was done by the Commissioner in his attempt to prove that Thomas fraudulently overstated his sales promotion expenses. We think that the Commissioner has failed to show by clear and convincing evidence that Westerhaus knowingly deducted entertainment or other expenses which it did not incur, with intent to evade tax. We hold that no part of the deficiencies in Westerhaus's income tax for the taxable period 1946 and the years 1947 through 1950 was due to fraud with intent to evade tax. For the same reasons, we hold that Westerhaus's returns for the taxable period 1946 and for the years 1947 through 1950 were not fraudulent with intent to evade tax. Next, we must decide whether *97 the bar of the statute of limitations has been lifted for the taxable period 1946 and the year 1947 by virtue of a 25 per cent omission from gross income. It is stipulated that the waivers for those periods are to have no force and effect unless section 275(c) applies. However, that section can have no application here, since the understatement of Westerhaus's net income, as determined by the Commissioner, is the result of excessive deductions and does not result from the omission of gross income. H. A. Hurley, supra.It follows that the deficiencies in Westerhaus's income tax for the taxable period 1946 and the year 1947 are barred by the statute of limitations. Issue (6). Miscellaneous Business Expenses - Joseph Westerhaus The Commissioner determined that the cash payments made to Joseph by Westerhaus in the years 1951, 1952 and 1953 in reimbursement of entertainment, Christmas, and picnic expenses allegedly incurred by Joseph on Westerhaus's behalf, constituted taxable dividends to Joseph since he was unable to substantiate the expenditures. One of the revenue agents who interviewed tavern and cafe owners where Joseph allegedly incurred entertainment expenses admitted that about *98 20 per cent of those interviewed stated that Joseph came into their taverns or cafes occasionally and spent money there. Nevertheless no deduction was allowed by the Commissioner for any of the claimed expenses because any amount allowed would have been arbitrary and without basis. In Issue (5) we resorted to the Cohan principle in order to determine the amounts of entertainment and picnic expense incurred by Joseph on Westerhaus's behalf in order to determine the amount of the deductions allowable to Westerhaus. The issue here and Issue (5) are corollaries. We are now dealing with the other side of the coin. Our holding in Issue (5) is decisive of the issue here. Accordingly we hold that Westerhaus's payments to Joseph were in reimbursement of picnic expenses in the amount of $500 in 1951 and were in reimbursement of entertainment expenses in the amounts of $2,000 in each of the years 1951 and 1952, and $1,000 in 1953. We also hold that Joseph has failed to show that he incurred the Christmas expenses on Westerhaus's behalf in 1951 and 1952, for which he received reimbursement from Westerhaus. The amounts received by Joseph from Westerhaus in excess of the amounts which we have held *99 are properly deductible by Westerhaus are taxable to Joseph. Issue (7). Claimed Loss of Coin-Operated Machines and Starter Money On its tax returns Westerhaus deducted as capital losses the unrecovered cost of certain of its machines. Some of these machines were lost as the result of theft or destruction by fire. The amounts of such losses are properly deductible. The remainder of the claimed losses resulted from what is described in testimony and other evidence as "confiscated" machines. Exactly what is meant by the term "confiscated" is not explained, but we gather from the record that the machines were seized by the police or other local officials because they were allegedly being used in violation of the local gambling laws. The Commissioner argues that to allow such a deduction would violate public policy, citing Commissioner v. Longhorn Portland Cement Co., 148 Fed. (2d) 276 (C.A. 5). The petitioner, on the other hand, contends that the machines were not used in violation of the laws, and even if they were, the losses are properly deductible under the authority of Commissioner v. Doyle, 231 Fed. (2d) 635 (C.A. 7). We think the arguments of the parties miss the point, which *100 to us is whether or not the petitioner has established or proven any loss at all. On this the petitioner has the burden. To establish a deductible loss it must be shown that there has been an actual loss resulting from a closed transaction. As a general rule this is not the case where a taxpayer has failed to exhaust his remedies to recover or reduce the loss. See Mertens Law of Federal Income Taxation Vol. 5, section 28.08. The taxpayer here apparently relies on the seizure or "confiscation" of the machines by the authorities as being the "identifiable event" which established the loss. But the seizure in and of itself did not result in the loss of the machines. There is no evidence that they were destroyed or that they could not have been recovered had steps been taken to do so. It is clear that remedies were available for their recovery for Joseph himself testified "in a lot of cases we got the machines back after a trial in police court, we would get the machines returned to us, there was no gambling violation." Presumably, had a reasonable effort been made, recovery could have been had in all cases, assuming that the machines were not illegal per se or were not being used in *101 violation of law. [This assumption is based on the petitioner's own theory of the case. ] There has been no showing that the petitioner exhausted its remedies to recover the machines and we are of the opinion that no complete loss has been proved. In the circumstances we hold that the petitioner has not carried its burden of proof and we sustain the Commissioner's disallowance of the loss claimed with respect to the "confiscated" machines. We note here that in Issue (5) we held that the statute of limitations bars collection of deficiencies in Westerhaus's taxes for the taxable period 1946 and the year 1947. It follows that our findings on this issue will not affect those years. Issue (8). Stock Sales of Wholly Owned Corporations The last issue involves the question of whether the proceeds received by Joseph on the sale of stock of one wholly owned corporation to another wholly owned corporation constituted taxable dividends to him. Joseph argues that the stock sales in issue are not redemptions or cancellations of stock within the meaning of section 115(g)(1)[5] and therefore the proceeds of the sales are not essentially equivalent to the distribution of a taxable dividend. As support *102 for his argument Joseph relies on Rodman Wanamaker Trust, 11 T.C. 365, affd. per curiam 178 Fed. (2d) 10 (C.A. 3, 1949), and the legislative changes which followed as a result of that case. He also relies strongly upon Commissioner v. Pope, 239 Fed. (2d) 881 (C.A. 1, 1957), affirming a Memorandum Opinion [15 TCM 181,; T.C. Memo. 1956-41, of this Court. In the Wanamaker case, a wholly owned subsidiary purchased some of the stock of its parent from the latter's controlling stockholder at a price which was the approximate book value of the shares in order to permit the shareholder, a trust, to make distributions *103 to its beneficiaries. We held that the proceeds of the sale did not result in a distribution to the trust substantially equivalent to a dividend under section 115(g), since the subsidiary corporation did not cancel or redeem "its stock." Section 115(g)(2)[6] *104 was passed as a part of the Revenue Act of 1950 to plug the loophole demonstrated by the Wanamaker case. At the same time, the House Ways and Means Committee recommended that a provision be added to section 115(g)(2) which would require the application of the principles of section 115(g) to cases where the acquisition of stock is made by a corporation controlled by the same interests as control the corporation which sells its stock. House Report No. 2319, 81st Cong., 2d Sess., p. 90, 1950-2 C.B. 380 at 444. The Senate however deleted that provision because it was not clear that the effect was the same as a redemption of stock by the corporation which sells its stock. Senate Report No. 2375, 81st Cong., 2d Sess., p. 43, 1950-2 C.B. 483 at 514. Joseph argues therefore that since Congress considered applying section 115(g) to stock transactions similar to the ones with which we are now concerned, and affirmatively rejected such an application, then it is clear that the Commissioner erred in holding that the amounts received from the sales of the stock were essentially equivalent to the distribution *105 of taxable dividends, and he cites Commissioner v. Pope, supra. In the Pope case, the taxpayer, who owned a substantial majority of the stock of two separate corporations, sold some shares in one of those corporations to the other corporation, and reported the profit from the transaction as a long-term capital gain. The reason for the sale was to obtain cash for use in a business unrelated to the activities of the two corporations. It was held that the sale did not lack "economic reality" and that the proceeds of the sale did not result in a dividend taxable as ordinary income, except to the extent that they exceeded the fair market value of the stock sold, which amount was determined. The Commissioner argues that here there is no business purpose or economic reality in the so-called "sales" of stock and that in substance the transaction resulted in withdrawals of earnings and profits from the wholly owned corporations which are taxable to Joseph as dividends under section 115(a). [7] The Commissioner also makes two alternative arguments. First, that in substance the stock of the controlled corporations was cancelled or redeemed at such time and in such manner as to make the distribution *106 or cancellation or reduction essentially equivalent to the distribution of taxable dividends under section 115(g)(2); and, second, that Joseph failed to establish the fair market value of the stocks transferred so that all the proceeds are taxable as dividends under section 22(a). In Emma Cramer, 20 T.C. 679 (1953) we considered basically the same situation with which we are here concerned. In the Cramer case we held that amounts received by stockholders from a controlled corporation for the transfer of their stock interests in other controlled corporations, at prices based upon the appraised liquidation values of the latter, were not taxable as dividends within the meaning of section 115(a). We think that our case is indistinguishable in principle from the Wanamaker, Cramer, and Pope cases and on the basis of those cases *107 we hold that the proceeds of the stock sales received by Joseph did not constitute dividends to him within the meaning of sections 115(a) and 115(g). The Commissioner's argument that the proceeds of the sale are taxable to Joseph under section 22(a) is based on the portion of Regulations 111, Section 29.22(a)-1, and Regulations 118, Section 39.22(a)-1, as set out in the latter section: "If property is transferred by a corporation to a shareholder, for an amount less than its fair market value, regardless of whether the transfer is in the form of a sale or exchange, such shareholder shall include in gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of a distribution of earnings or profits taxable as a dividend." The Commissioner argues that the small blocks of Westerhaus and Victory stock which were transferred could not have any fair market value to third parties dealing at arms length with Joseph since control of the corporations would remain in Joseph's hands. The sale price of the stock in each instance was at its book value. No other evidence was introduced to show the *108 fair market value of the stock. In the absence of any different showing, however, the book value of the stock is sufficient evidence of its actual value to shift the burden of going forward to the Commissioner. B. F. Edwards, 39 B.T.A. 735 (1939); Ralph Perkins, 41 B.T.A. 1225, affd. 125 Fed. (2d) 150 (C.A. 6, 1942). No evidence was introduced by the Commissioner to show that the book value was unreliable as an approximation of the fair market value of the stock. We hold that the amounts received by Joseph as a result of the stock sales do not constitute dividends to him, but represent the proceeds of a sale, taxable to him as capital gains. Decision will be entered for the petitioner in Docket No. 57551. Decisions will be entered under Rule 50 in Docket Nos. 57549, 57550, 57552, 57553, 57554, 59557, and 59558. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Joseph Westerhaus and Marian A. Westerhaus, Docket Nos. 57550, 59558; Joseph Westerhaus, Docket No. 57549; Thomas Jackson, Docket No. 57551; Thomas Jackson and Celia Jackson, Docket No. 57552; Estate of Frances Westerhaus, Deceased, Joseph Westerhaus, Executor, Docket No. 57553; and Westerhaus Company, Docket No. 57554.↩
1. Hereafter referred to as the "taxable period 1946." ↩
2. Hereafter referred to as the "taxable period 1953."↩
3. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
4. SEC. 275. (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.↩
5. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (g) Redemption of Stock. - (1) In General. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.↩
6. (2) Redemption Through Use of Subsidiary Corporation. - If stock of a corporation (hereinafter referred to as the issuing corporation) is acquired by another corporation (hereinafter referred to as the acquiring corporation) and the issuing corporation controls (directly or indirectly) the acquiring corporation, the amount paid for the acquisition of the stock shall constitute a taxable dividend from the issuing corporation to the extent that the amount paid for such stock would have been considered, under paragraph (1) [see footnote 5], as essentially equivalent to a taxable dividend if such amount had been distributed by the acquiring corporation to the issuing corporation and had been applied by the issuing corporation in redemption of its stock. For the purposes of this paragraph, control means the ownership of stock possessing at least 50 per centum of the total combined voting power of all classes of stock entitled to vote or at least 50 per centum of the total value of shares of all classes of stock of the corporation.
7. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (a) Definition of Dividend. - The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits or the taxable year * * *.↩