William W. BROWN, Helen Brown, Emily M. Kiekbusch, Edward S. Vassaw and Alexina Vassaw, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 1908.

United States District Court E. D. Michigan, N. D.

Feb. 3, 1960.

10. Sullivan v. Minneapolis & R. R. Ry. Co., 121 Minn. 488, 142 N.W. 3, 45 L.R. A.,N.S., 612.

11. Watab Paper Co. v. Northern Pac. Ry. Co., 8 Cir., 154 F.2d 436.

**834**

Smith & Brooker, Bay City, Mich., Cummings & Wyman, Chicago, Ill., for plaintiffs.

Fred W. Kaess, U. S. Atty., Elmer Pfeifle, Jr., Asst. U. S. Atty., Detroit, Mich., Charles K. Rice, Asst. Atty. Gen., for defendant.

PICARD, District Judge.

The question in this case revolves around whether "sale" of certain stocks should be reported as "capital gain" or "dividend." Plaintiffs, the taxpayers, first made their returns as "capital gain" but the Internal Revenue Department assessed deficiencies which taxpayers now sue to recover.

Here are the facts—

Saginaw Transfer Company, Inc. (hereinafter called "Transfer") was incorporated October 1, 1945 as a public carrier with terminals throughout the state of Michigan and certain places in Illinois. Two years later, January 29, 1947, Saginaw Transfer Equipment Company (hereinafter called "Equipment") was formed—the source from which Transfer got all its vehicles by rental.

In March, 1954 Equipment stock (2500 common) was divided as follows—

| | |
|---|---|
| William W. Brown | 1000 shares |
| Emily M. Kiekbusch | 140 " |
| Edward S. Vassaw | 140 " |
| Elsa S. Brown (wife of Carman, is a resident of Illinois and is not in this action.) | 1220 " |

and at that time the 50,000 shares of Transfer were held as follows—

| | |
|---|---|
| Carman S. Brown (older brother of William) | 21,100 shares |
| William W. Brown | 18,700 " |
| Rex Allen | 1,800 " |
| Edward S. Vassaw | 2,800 " |
| Emily M. Kiekbusch | 2,800 " |
| Vincent Pettinger | 2,800 " |

From its incorporation to the time of the disputed transaction neither company had paid a dividend and while they were housed in the same building with the same officers, they were actually conducted as two separate corporations. Then on March 20, 1954 Transfer made an installment agreement with all stockholders of Equipment to purchase all of their Equipment Company stock for $500,000 or $200 per share. A down payment of $100,000 was made which Transfer borrowed from Carman S. Brown. Balance was to be paid at the rate of $40,000 on or before December 31 annually thereafter, beginning with 1955.

In disallowing the claim of "capital gains" the government insisted that the entire transaction was a "sham sale" relying chiefly on two points—relationship of the parties and some details of the sale itself.

Attorneys for both sides presented this court with a stipulation of facts, which we felt left much information still to be desired. Therefore on February 24, 1959 we asked sixteen questions, now part of the record with answers, since we too felt that a transfer and claim of this kind should be carefully scrutinized. We even questioned the "source" and the "why" of the money, especially where the money of Elsa, wife of Carman Brown, came from. That was minutely explained in court and evidently defendant could find no reason to attack the explanation. The value of the stock was also verified satisfactorily to this court.

But what investigation was made by the government to secure answers to our questions this court does not know for our letter was followed almost immediately by a supplemental "stipulation of facts" based on answers to our questions but not being particularly enlightening to this court. One of the answers, for example, to at least three questions was

"Parties cannot agree on the answer to this question," and the only evidence we had to augment the stipulation was furnished by plaintiffs at the hearing, since defendant put on no testimony.

So today we approach this question completely on the stipulation and some additional legal points raised by defendant. For example, defendant claims that this was not really a debt chiefly because of the uncertainty of payment. We disagree. We think it was a debt of the Transfer Company. Also government claims that Transfer itself did not treat this as one of its "contingent" liabilities. We think it did. It made reference to the agreement in its report to the I.C.C. which I.C.C. could have perused if it had been interested.

With all the information now being available the government still claims that as a question of law this was a "sham" sale. But we can find no reason why this should be so considered even though there was a family relationship that certainly justified the Commissioner in having his suspicions.

There were also the two agreements. One is a ten page document—somewhat unusual—describing the reciprocal rights and obligations of the parties thereto to buy and sell Equipment stock and the obligations of the parties to creditors of the Transfer Company, mainly monies owed to the Aid Association for Lutherans, which had made sizable loans to the Transfer Company for which the Equipment Company stock had already been pledged. There was also a separate agreement which specified that the Equipment shares should remain pledged with the Aid Association until the debt, or eventually new loans from the Aid Association, were paid in full. When that happened the stock was to be placed in escrow and the Transfer Company would acquire it when these facts were established—

"When the Purchaser shall have paid twenty per cent (20%) of the purchase price of said stock. * * Purchaser shall be entitled *upon request* to have transferred and delivered to it ten per cent (10%) of shares of stock, so being purchased, and as Purchaser shall pay each ad-

ditional ten per cent (10%) of the purchase price, it shall be entitled to have transferred and delivered to it an additional five per cent (5%). * * *When the entire purchase price hereby contracted to be paid shall have been paid in full, all of the shares of stock being purchased shall thenceforth belong to and be the property of purchaser* and it shall be entitled to have all of said shares transferred and delivered to it." (Emphasis ours.)

We scanned the provisions of both agreements. For example—blank assignments to Aid Association were executed and delivered by Equipment stockholders to facilitate release to and by the escrow agent. This is not unusual. The agreement also provided that sellers had a right to forfeiture if Transfer remained in default on its purchase for one year, in which event stock not transferred was to be returned to sellers, (with the exception that if all Transfer Company's net profits for the period had been applied towards the purchase, forfeiture was precluded.) This last provision irked the Commissioner but it was an understandable provision between brothers who were not hostile to each other.

In addition to the debt due Aid Association, Transfer was substantially liable on two trust mortgages. These three debts were collectively referred to as "Funded Debt" and obligations under Agreements, as well as the March 20, 1954 note in favor of Carman S. Brown, were subordinated thereto. For example—parties agreed not to pay or receive sums in advance of above terms so long as any of the Funded Debt remained unpaid; pending any default of Funded Debt, no payment was to be made on purchase or note; rights of holders of Funded Debt to enforce subordination were specifically not precluded by holders' lack of knowledge or Transfer Company's failure to enforce subordination; and modification of Agreement without consent of holders of Funded Debt was prohibited.

Although Aid Association for Lutherans' debt was still outstanding February 3, 1955, stock was delivered to Second National Bank and Trust Company of Saginaw, Michigan escrowee, pursuant to escrow agreement between escrowee, Aid Association, and Transfer Company, which specified:

"Payments on account of said purchase price shall be made by the Purchaser directly to the Sellers and you shall adjust your records as provided in this paragraph as and when you receive from time to time statements in writing from the Sellers as to the amounts paid on account of such purchase price."

and

"All of said stock shall remain in your possession until you receive from said Aid Association for Lutherans a statement in writing that all indebtedness owing to it by the Purchaser has been paid in full and thereafter upon written request of the Purchaser you shall release to it such stock from time to time as may stand to its credit upon your records."

Plaintiffs proved that, immediately prior to expiration of effective date of 1939 Internal Revenue Code as extended by 1958 Technical Amendments Act, 72 Stat. 1606, balance owing on the purchase price was paid, December 27, 1958. Government then proved that Funded Debt remains outstanding and that stock remains in escrow in answer to plaintiffs' reply that escrow agent was reluctant to effectuate transfer. This transfer of stock has now been made (as we are informed) and Equipment Company has been dissolved.

It was also shown that prior debts to Aid Association were paid July 1, 1957, and replaced on that date by new loan for $525,000, guaranteed by William W. Brown, Carman S. Brown, a mortgage on some Transfer Company realty, and pledges of William W. Brown life insurance policies totaling $300,000. Somewhat intricate, we agree, but nothing to

show fraud and made necessary to some extent by the family relationship.

■ We are aware in arriving at these findings of fact that there were and still are certain "suspicions" present but suspicions are not "facts" and were it not for the relationships involved we doubt very much if there would be any "suspicions"; and at that time "relationships" were of no great moment in construing acts of stockholders even though as the Commissioner emphasized

"the substance of what was done controlls rather than the form in which the transaction was cast."

■ Undoubtedly these plaintiffs pay less taxes under their own interpretations but as has been pointed out time and time again the taxpayer has the right to legally minimize his tax obligations. He doesn't have to take the step that makes him pay a tax.

### Conclusions of Law

■ Now the significance of these facts. The Revenue Act of 1939 provided as follows—

26 U.S.C. § 115(g)

"(1) In general

"If a corporation cancels or redeems its stock * * * at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

"(2) *Redemption through use of a subsidiary corporation.* If stock of a corporation (hereinafter referred to as the issuing corporation) *is acquired* by another corporation (hereinafter referred to as acquiring corporation) and the issuing corporation controls (*directly or in-*

*directly*) the acquiring corporation, the amount paid for the acquisition of the stock shall constitute a taxable dividend from the issuing corporation * * *. For the purposes of this paragraph, *control means the ownership of stock* possessing at least 50 per centum of the total combined voting power of all classes of stock entitled to vote or at least 50 per centum of the total value of shares of all classes of stock of the corporation." (Emphasis ours.)

Note: There was an amendment in 1954 but it does not affect this case.

This act treats as dividends only receipts from stock acquisitions redeemed by an issuing company or through use of a subsidiary controlled by issuing company. The transaction in the instant case was not redemption through a subsidiary, and not covered. To state the matter in the language of the act: the issuing corporation (Equipment) did not control acquiring corporation (Transfer) either *directly or indirectly* at the time of the acquisition.

The government bases its action on sub-section (2) above. We agree that it controls to the extent of justifying the Commissioner in putting a heavier burden on the taxpayer, chiefly because of the words *"directly or indirectly"* included therein. But we have not been shown that the "issuing corporation" (Equipment) either *"directly or indirectly"* controlled the acquiring (Transfer) corporation unless you say that this stock was really Carman's or vice versa, and the only basis for that conclusion would be the mere fact that Elsa is the wife of Carman and the law (1939) at that time did not warrant such conclusion.

We get the impression that defendant agrees that if this is not a "sham" sale, then Cramer v. Commissioner, 20 T.C. 679; Westerhaus v. Commissioner, 16 T.C.M. 958 and Commissioner of Internal Revenue v. Pope, 1 Cir., 239 F.2d 881 should control and the position of plaintiffs sustained.

838

Yet the government urges that the relationships of the parties plus the fact that no dividends had been issued by either firm necessarily indicates "sham" (1954 law). For instance, while Carman Brown was not a shareholder of Equipment Company his wife was and it was he who advanced the loan to Transfer to make the initial payment on the purchase of Equipment stock. But is it not possible that he did so in order that he and other Transfer Company shareholders who owned no Equipment stock would not find their interests jeopardized by Equipment Company's rentals and desired to equalize control of the two companies by making them into one?

Of course "sham" is possible if one indulges the fiction that husband and wife are synonymous because William Brown, Carman and his wife constitute majority stockholders of both corporations. But no *evidence* of sham was presented by the government, and lacking clear, convincing evidence, we are reluctant to indulge in fictions to conclude sham existed.

In short, the government's position is based on "presumption", not "evidence" of sham. Perhaps the tone of the Agreement, subordinating itself to the holders of Funded Debt impressed the Collector as "sham" because of its irrelevancy to the stock transfer. However, the matter would be highly pertinent to prior creditors' interests in liquidity, and even solvency of Transfer Company. The execution of Agreement by an officer who was dealing with himself as a seller, likewise, not mentioned specifically by the Government, might have unfavorably impressed the Department. But again this does not repudiate the reality of the sale.

We therefore hold that the transaction constituted a sale consummated within the effective period of the 1939 Act. It being stipulated that the question of computation is not before us, the matter is referred to Department of Internal Revenue for computation and refund in accordance herewith.